**Maggie DUDLEY, Individually and as guardian ad litem for James Dudley, a minor**

**v.**

**SOUTH JERSEY METAL, INC., a corporation of the State of New Jersey, Appellant.**

**No. 76–2019.**

United States Court of Appeals, Third Circuit.

Argued Feb. 25, 1977.

Decided April 20, 1977.

Arthur Montano, Alan P. Bruce, Kisselman, Deighan, Montano & Summers, Camden, N. J., for appellant.

Tod I. Mammuth, Herbert Monheit, Monheit & Mammuth, Philadelphia, Pa., for appellee.

Before GIBBONS, FORMAN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The dominant issue in this products liability case is whether or not the trial court erroneously precluded the defendant from presenting crucial evidence that it did not fabricate the injury-producing article. The complaint, based on diversity jurisdiction and alleging personal injuries to the minor plaintiff, was tried to a jury and a verdict returned in favor of the plaintiff Maggie Dudley, individually and as Guardian Ad Litem for James Dudley, a minor, in the sum of $40,000. The district court denied defendant's motions for a directed verdict, judgment notwithstanding the verdict, or in the alternative, for a new trial. The United States District Court for the District of New Jersey entered judgment against the defendant, South Jersey Metal, Inc. ("SJM"), and it has appealed. We reverse and remand for a new trial as to both liability and damages.

## I.

James Dudley ("Dudley") had been employed for about six months as a dishwasher and porter in a Horn & Hardart restaurant in Philadelphia, Pennsylvania. On June 23, 1969, while picking up a mat off the floor which he was cleaning, his right wrist came in contact with the underside of a metal dish table allegedly manufactured by South Jersey Metal. Dudley severely lacerated his wrist and severed three tendons and a nerve. In her original complaint, the plaintiff alleged that the injuries were the direct result of SJM's negligence in permitting a dangerous condition to exist in the table and in failing to repair or give warning of its presence. The complaint was subsequently amended to include an allegation of strict liability under section 402A of the Restatement (Second) of Torts (1965) as interpreted by the courts of Pennsylvania.

The evidence reveals that immediately after the accident Dudley was rushed to the Nazareth Hospital where he submitted to surgery and remained as an inpatient for five days. Because the wrist did not respond to treatment, he was admitted approximately eight weeks later to Hahnemann Hospital for additional surgery. Dudley returned to work at Horn & Hardart four months after the accident.

On appeal, SJM raises a number of issues, the principal one of which is that the trial judge precluded SJM from presenting certain critical evidence showing that the section of the dish table which caused Dudley's injury was added by someone other than the defendant subsequent to the delivery of the table to Horn & Hardart. This evidence might have been determinative of the case, for Pennsylvania law places upon the plaintiff the burden of proving that the product which caused his injury was in a defective condition at the time it left the hands of the seller. *See Wojciechowski v. Long-Airdox Div. of Marmon Group, Inc.,* 488 F.2d 1111 (3d Cir. 1973). In his opening statement to the jury, counsel for SJM conceded that his client had in fact fabricated a stainless steel kitchen setup for Horn & Hardart which it installed in 1965 in accordance with certain specifications and drawings. The installation had been inspected and approved by Horn & Hardart. Counsel further stated that Joseph Wagner, SJM's general manager, would prove that the ta-

ble built by SJM had been extended an additional twelve inches, that the extension and additional support brackets were added by someone other than SJM, and that it was one of these brackets which caused Dudley's injuries.

Plaintiff did not object then to this line of defense but one and one-half days later, at the close of plaintiff's case, her counsel moved for an order under Rule 26(e) of the Federal Rules of Civil Procedure to preclude the defendant from presenting evidence that the table had been extended by someone other than SJM after the installation and that the supporting bracket which produced Dudley's injuries had been fabricated and installed by someone other than SJM. The district court granted plaintiff's motion and excluded the evidence. The court held that SJM had a duty under Rule 26(e)(2)(A) and possibly (B) [1] to notify the plaintiff timely of defendant's belief that it had not manufactured the injury-producing bracket. The court predicated the duty upon the defendant's failure to correct its contrary response to one of plaintiff's interrogatories in which defendant had indicated that it had manufactured and assembled the table and brackets in question. Since SJM learned subsequently that its answer to interrogatory No. 15 was incorrect or ambiguous, the district court held that "the defendant had a duty to amend its answer under rule 26." The trial judge viewed the failure to do so as a breach of duty which justified the sanctions he imposed in precluding defendant's proof of the alteration of the table. Although SJM was barred from presenting evidence of alteration to the jury, it was permitted to argue to the jury on summation that plaintiff had failed to carry her burden of proving that the table was substantially in the same condition at the time of the injury as it was when delivered and installed.

In response to plaintiff's motion to exclude the evidence of alteration, SJM contended in the district court—and contends on appeal—that it gave no answers during discovery which were inconsistent with SJM's theory that the table had been altered by Horn & Hardart after installation. The chief controversy concerns questions addressed to Wagner, president of SJM, at his deposition on September 21, 1972. Plaintiff believes that Wagner deliberately avoided informing her of the true nature of SJM's contemplated defense despite several opportunities to do so. When Wagner was shown snapshots of the table during his deposition, for example, he admitted that SJM fabricated the table without noting that SJM did not manufacture the bracket which produced the injury. Plaintiff views this response by Wagner as a willful misrepresentation by omission. Plaintiff also finds fault with Wagner's answer to the question how the bracket edge could have become sharp if it had not been sharp when installed: Wagner speculated that the bracket edge could have been sharpened as trash cans and other metal objects were squeezed under it over a period of years but he failed to seize on the question as an opportunity to deny making the particular bracket which allegedly caused the injury. As an additional instance of deception, plaintiff pointed to Wagner's acknowledgment that SJM had built the unit shown on a blueprint of the kitchen without commenting that the sharp bracket and the table extension which it supported were not indicated on the blueprint. Finally, plaintiff claimed that SJM's pre-trial conference position that "any defect relating to the equipment occurred after installation" was deliberately vague and ambiguous under the circumstances.

For its part, SJM vigorously denies any intent to mislead plaintiff. SJM insists that Wagner could not tell from the snapshots he was shown that the table had been

---

1. Rule 26(e)(2) of the Federal Rules of Civil Procedure, 28 U.S.C.A. provides:

(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

altered and extended. At the time of the deposition, Wagner had not seen the table since its installation a number of years before and had no way of knowing that it had been altered. Furthermore, SJM points out, Wagner was never asked whether SJM had manufactured the particular part of the table which caused the injury; SJM argues that it had no duty to read into the question anything which was not asked. SJM claims that it did not learn of the alteration of the table until Wagner's visit to the Horn & Hardart restaurant in November 1972, subsequent to both Wagner's deposition and the pre-trial conference. In addition, SJM maintains that plaintiff was on notice, by reason of the blueprints furnished her, that SJM did not manufacture the injury-producing bracket: a comparison of the plans with the table as it existed at the time of the accident would have revealed, argues SJM, that Wagner had not admitted to manufacturing the bracket in question. Finally, SJM asserts in its brief in this court that at one of the pre-trial or settlement conferences, its attorney "indicated to plaintiff's counsel that one of SJM's defenses was that it did not make that part on which plaintiff was injured."

The trial judge predicated his order precluding SJM from producing evidence that it did not fabricate the extension to the dish table on part 2(A) of Rule 26(e) which requires a party to timely amend a prior response to an interrogatory when he obtains information "that the response was incorrect when made." In reviewing Wagner's discovery responses as well as certain equivocal language in SJM's articulation of its factual contentions for the pre-trial order, the district court concluded in its memorandum opinion that SJM had given ambiguous answers during discovery and that the ambiguity was such as would make the responses "incorrect" within the meaning of Rule 26(e)(2)(A) because "[t]his ambiguity apparently was intentional on the part of the defendant since confusion of the plaintiff as to trial tactics of the defendant was conceded at oral argument on the motion to be the reason for failure to amend."

In the view of the district court, additional evidence that SJM's failure to amend was deliberate was furnished "by the fact that at oral argument at trial defense counsel conceded that it was part of the defendant's strategy not to amend." The district court believed that SJM had determined to take advantage of the confusion caused by this strategy so that "[b]y the time the concealment was brought to light, discovery had been completed, the issues had been narrowed, [plaintiff would have] prepared for trial in reliance on the fact that use would be the defense but not a subsequent product alteration."

On appeal, SJM protests that nothing in the record supports the district court's finding that it set out deliberately to mislead plaintiff. We have concluded that SJM is correct: our own careful review of the record reveals no evidence of willful deceit and counsel for plaintiff was unable at oral argument to refer us to any specific portions of the record which would lead to a contrary conclusion. SJM may be criticized for the ambiguity of its pleadings and the obscurity of Wagner's deposition responses, but plaintiff's counsel may himself also be held partially responsible for the misunderstanding since he had the benefit of the blueprints depicting the table as originally fabricated yet failed to notice the difference between what was shown by the plans and what actually existed.

Whatever the division of responsibility for the misunderstanding, defendant must bear some of the blame. The question is what sanctions would have been appropriate. Although we recognize that under our legal system counsel owe a duty to each other and to the court to be candid in their pleadings and in discovery and not to lay a trap for the unwary by artful pleading or half-truths, not every ambiguous answer warrants a sanction as extreme as that imposed in the instant case.

As support for the sanctions imposed by the district court, plaintiff points to *DiGregorio v. First Rediscount Corp.*, 506 F.2d 781 (3d Cir. 1974), where we approved the district court's dismissal of an action with-

out a specific finding of willfulness. Two factors distinguish the case *sub judice* from *DiGregorio*, however: first, in *DiGregorio* willfulness was "mirrored in the record," *Norman v. Young*, 422 F.2d 470, 474 (10th Cir. 1970), and we expressly refrained from deciding whether a finding of willfulness would be necessary in other circumstances, 506 F.2d at 788; secondly, the district court in *DiGregorio* confronted a pattern of conduct by the plaintiff which was in "flagrant disregard both of the general rules of discovery and of a *specific court order.*" 506 F.2d at 788 (emphasis supplied).

The plaintiff in *DiGregorio* had failed to answer several specific interrogatories of the defendant and other replies were "inadequate or unresponsive." In addition, all of plaintiff's answers in *DiGregorio* failed to conform to Rule 19 of the local United States District Court. Also influencing our holding in that case was plaintiff's repeated failure in the face of a court order and three hearings to file amended and sworn answers to defendant's interrogatories.[1A]

None of the *DiGregorio* factors is present in the instant case. SJM did not flaunt a specific order of the court; it exhibited no pattern of repeated misconduct and defiance of a court order; we can discover no evidence of bad faith. Putting the worst interpretation on SJM's failure to amend its answer to the interrogatory, we view it as the product of sheer neglect and perhaps also a lack of professional courtesy on the part of SJM's counsel. Of course, the failure to amend may have led the plaintiff to believe the defense would be "use" rather than "alteration" of the product, but a more appropriate sanction under the circumstances would probably have been a mistrial with costs taxed to the defendant. Under the foregoing circumstances, we hold that it was an abuse of discretion for the district court to bar the defendant from introducing evidence critical to its defense, namely, that it did not manufacture the additional section of the table and the bracket which produced Dudley's injury.

This holding does not resolve the issue, however, for plaintiff contends that the district court's exclusion of the defendant's evidence "had absolutely no effect" on the presentation of defendant's case. Reminding us that the defendant argued in great detail in summation that the condition of the table was changed after installation by SJM, plaintiff contends that the case was in fact decided on its merits. We cannot agree. It is little solace to the defendant that it was permitted to argue to the jury without being fortified by solid evidence in the record. The jury was looking for actual proof of alteration, not unsubstantiated argument on the part of the defendant. Argument to a jury under such circumstances is illusory and may even be self-defeating. When the district court prevented SJM from presenting evidence that it did not manufacture the additional section to the table, it virtually destroyed SJM's sole defense. We must therefore reverse the judgment of the district court.

## II.

We must now decide whether SJM is entitled to judgment notwithstanding the verdict as it insists or only to a new trial. SJM moved for a directed verdict at the close of plaintiff's case on the ground that plaintiff had not established a breach of any duty owed Dudley, that someone else had altered the table subsequent to its installation, and that the plaintiff had failed to establish the existence of any defect in the equipment when it was under SJM's control. This motion was denied, but it was

---

**1A.** We also distinguish *Nat'l Hockey League v. Metropolitan Hockey, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam), in which the Supreme Court approved the dismissal by a district court of an antitrust action as a sanction for plaintiff's failure to timely answer written interrogatories. The Supreme Court concluded that the record amply supported the district court's findings that plaintiff's counsel had acted in "flagrant bad faith," with "callous disregard" of their responsibilities, and had also failed to comply with explicit orders of the court. The record in the instant case, on the other hand, contains no evidence of bad faith and no suggestion that counsel for SJM ever disregarded any order of the district court.

renewed on similar grounds at the close of all the evidence; it was again denied together with defendant's motion for judgment notwithstanding the verdict. Defendant is entitled to a judgment notwithstanding the verdict only if, as a matter of law, "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir. 1969). As we observed in *Fireman's Fund v. Videfreeze Corp.*, 540 F.2d 1171 (3d Cir. 1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977), "The trial judge in his review of the evidence, and this Court in its own appellate review, must expose the evidence to the strongest light favorable to the party against whom the motion is made and give him the advantage of every fair and reasonable inference." *Id.* at 1178.

In this posture of the case, the trial judge need not determine whether the evidence "preponderates" in favor of the movant defendant but should confine himself "to ascertaining whether the party against whom the motion is made adduced sufficient evidence to create a jury issue." *Id.* at 1178. The district court in the instant case concluded that there was sufficient evidence to warrant a denial of a motion for judgment notwithstanding the verdict.

SJM, however, contends that the plaintiff produced no evidence to establish that the defendant made and installed the injury-producing bracket. It asserts that the evidence established just the contrary—that the bracket was in fact not installed by SJM. SJM points to the concession by plaintiff's expert, after viewing the blueprint and photographs, that the dish table had been extended subsequent to its installation. Notwithstanding this evidence, however, we will not disturb the district court's denial of the motion for judgment notwithstanding the verdict if there is sufficient evidence to the contrary "to create a jury issue" and we conclude that there was:

in the absence of evidence to show alteration by someone other than SJM after the installation, the record in its present state reasonably would support an argument that it was SJM itself that altered the table after it made the installation. Neither the testimony of Wagner nor that of Mr. Halfpenny, Secretary of Horn & Hardart, is inconsistent with such a possibility.

Because the jury returned a verdict in favor of the plaintiff, we must examine the record in a light most favorable to the plaintiff, giving her the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn. *Continental Ore Co. v. Union Carbide*, 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Kademenos v. Equitable Life Assurance Society of the United States*, 513 F.2d 1073 (3d Cir. 1975). Viewing the record in this light, we believe there was a quantum of evidence to enable the jury reasonably to afford relief to the plaintiff. It follows that the district court properly denied the motion for judgment notwithstanding the verdict and we must remand the case to the district court for a new trial.

### III.

As there will be a new trial, we will address defendant's objection to the testimony of Dr. Saul Leshner, a vocational guidance expert. Plaintiff's future economic loss was projected through Dr. Leshner's testimony in conjunction with Mr. Bunn, an actuary who determined the present value of the future loss of earning capacity to be $58,520, assuming a work expectancy for Dudley of 43 years.[2] SJM believes that the district court erred in permitting Dr. Leshner to testify "despite the absence on his part of any of a variety of psychological, intelligence, or dexterity tests, or an evaluation or test of Dudley's ability to do any of the jobs which he had been doing or of which he was capable," that Dudley would have great difficulty

**2.** SJM contends that $40,000 was an excessive verdict in view of the injuries Dudley sustained. Since we reverse for a new trial, we need not address this contention directly but confine ourselves to discussing the admissibility of the testimony of Dr. Leshner and Mr. Bunn to which SJM attributes the alleged excess.

competing for menial jobs and would lose $2800 per year for the rest of his working life, some 43 years.

Defendant contends that Dr. Leshner's testimony was objectionable on two grounds: (1) it was highly speculative and the $2800 figure was not supported by any evidence that Dudley had ever been dismissed or laid off from a job because of any problems related to his injuries; and (2) even if the testimony was properly received, it was error to permit the witness to aggregate the present value of the future gross loss of earning capacity as $58,520.

■ The district court dealt with these questions in compliance with Pennsylvania law as enunciated in *Brodie v. Philadelphia Transportation Co.*, 415 Pa. 296, 203 A.2d 657 (1964), but the preliminary inquiry in deciding this issue is whether Pennsylvania law, New Jersey law, or federal evidentiary law is applicable to the admission of Dr. Leshner's testimony. Since the accident occurred in Pennsylvania and involved a Pennsylvania resident, Pennsylvania's substantive law might properly govern the right to recovery and the amount. *Zotta v. Otis Elevator Co.*, 64 N.J.Super. 344, 165 A.2d 840 (App.Div.1960). The admissibility of the testimony deduced by Dr. Leshner is an evidentiary question, however, and, since this trial was conducted prior to the adoption of the Federal Rules of Evidence, the district court was obligated to apply the rules of evidence of the forum state, Fed. Rules of Civ.Pro. 43(a), 28 U.S.C. *See also* Wright, *Law of Federal Courts*, § 93, pp. 409–411 (2d ed. 1970). We therefore hold that the law of New Jersey governs this issue.

■ Turning to the evidence, we note that Dr. Leshner did interview Dudley and based his opinion of Dudley's postinjury earning capacity on his personal observation of Dudley. To this information about Dudley, Dr. Leshner applied his acknowledged expertise in the requirements of various types of jobs and his familiarity with job market areas, and with occupational wage rates. Although his testing and evaluation of Dudley's ability to continue the type of work he had been performing before the accident leaves much to be desired, we believe there was a sufficient basis under New Jersey law to admit Dr. Leshner's basic testimony as to Dudley's future earning capacity and its impairment. He satisfied the New Jersey test as to experiential capacity, professional training, and occupation and knowledge essential to testimonial capacity. *Application of Plainfield-Union Water Co.*, 14 N.J. 296, 102 A.2d 1, 6 (1954). Although there was some question as to whether Dudley had ever been discharged or laid off after this accident because of the injuries and there is proof that he earned more per hour with Horn & Hardart after the accident than he did previously, this evidence went to the weight of Dr. Leshner's testimony and was for the jury. In addition, however, to testifying to the permanent impairment of Dudley's employment prospects, Dr. Leshner also was permitted to fix Dudley's future loss of wages at $2800 per year and to tell the jury that "[i]f we were to multiply that by 43 years, I think you would get the total earnings." The actuary Bunn was then asked, on the assumption of a loss of earnings of $2800 per year for 43 years, to reduce the sum to its present value at 6 percent simple interest. He fixed it at $58,520.

■ The defendant argues that this testimony of Dr. Leshner and the actuary permitted a presentation to the jury of damages in aggregate dollar terms contrary to the decision of the Supreme Court of New Jersey in *Tenore v. NuCar Carriers, Inc.*, 67 N.J. 466, 341 A.2d 613 (1975), decided after the trial and verdict in this case. In *Tenore*, the trial court had permitted the plaintiff's expert to present his conclusion as to damages in aggregate dollar terms, as was done in this case. The New Jersey Supreme Court held that the "projection of a gross figure before the jury submitted by an expert tends to exert an undue psychological impact leading to the danger of its uncritical acceptance by the jury in the

place of its own function in evaluating the proofs." 341 A.2d 622.[3]

The district court, however, held in its memorandum opinion that the *Tenore* decision was inconsistent with Pennsylvania cases which permit aggregate dollar damage testimony provided there is a proper foundation. *Hoffman v. Sterling Drug*, 485 F.2d 132 (3d Cir. 1973); *Magill v. Westinghouse Electric Corp.*, 464 F.2d 294 (3d Cir. 1972). Pennsylvania law, however, was, as we have discussed above, completely irrelevant on this issue. We hold that the district court erred in permitting testimony as to the aggregate dollar damage.

We have considered the remaining contentions of the defendant and find no merit to them.

The judgment of the district court will be reversed and the case remanded for proceedings consistent with this opinion.

---

**3.** The Supreme Court of New Jersey in *Tenore* indicated that it considered the proper method of presenting the expert testimony to be as follows:

What we do expect is that the experts will provide the jury with their analysis of trends of future wage increases and discount interest rates generally and that then, giving due regard to reliability, the jury will use those trends and rates in arriving at their own independent single-figure appraisal of plaintiff's pecuniary loss.

341 A.2d 622–23.